ACCEPTED
01-14-00965-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/10/2015 6:55:09 AM
CHRISTOPHER PRINE
CLERK

No. 01-14-00965-CR

IN THE

COURT OF APPEALS

FOR THE

FIRST DISTRICT OF TEXAS

AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

6/10/2015 6:55:09 AM

CHRISTOPHER A. PRINE
Clerk

_____

ELMER ALVARADO
Appellant

VS.

THE STATE OF TEXAS
Appellee

_____

APPELLANT'S BRIEF

_____

On Appeal from the 248th District Court
Harris County, Texas
Trial Court Cause No. 1381604

_____

Kyle B. Johnson
SBN: 10763570
917 Franklin, Suite 320
Houston, Texas 77002
Tel: (713) 223-4100
Fax: (713) 224-2889

ATTORNEY FOR
ELMER ALVARADO

# TABLE OF CONTENTS

TABLE OF CONTENTS   ii

INDEX OF AUTHORITIES        iii

INTERESTED PARTIES   iv

STATEMENT REGARDING ORAL ARGUMENT      v

CITATIONS TO THE RECORD   v

STATEMENT OF THE CASE      2

ISSUE PRESENTED        2

      WAS THE EVIDENCE LEGALLY SUFFICIENT TO SUPPORT THE APPELLANT'S CONVICTION?      2

STATEMENT OF FACTS  2

    State's Motion in Limine    2

    Voir Dire      3

    State's Case  3

    Punishment   15

        State's Case   15

        Defense's Case        16

ISSUE PRESENTED (restated)    16

SUMMARY OF THE ARGUMENT      16

ARGUMENT        17

CONCLUSION      19

PRAYER      19

CERTIFICATE OF COMPLIANCE     20

CERTIFICATE OF SERVICE     21

# INDEX OF AUTHORITIES

Cases

*Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010) (plurality op .)    18

*Guia v. State*, 723 S.W.2d 763, 765 (Tex.App.—Dallas 1986, pet. ref'd)    17

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)    18

*Jenkins v. State*, 912 S.W.2d 793, 814 (Tex. Crim. App. 1995) (op. on reh'g) 4

Rules/Statutes

Tex.Penal Code Ann. § 21.11(a)(1) (Vernon 1989)    17

Tex. R. Evid. 702    4

Tex. R.Evid. 705(b)    4

## INTERESTED PARTIES

Judge:  The Honorable Katherine Cabaniss
Presiding Judge, 248th District Court, Harris County, TX
1201 Franklin, 16th Floor
Houston, TX 77002

Prosecutors:  Ms. Erin Epley (trial)
Assistant District Attorney
Harris County District Attorney's Office
1201 Franklin
Houston, TX 77002

Mr. Alan Curry (appeal)
Assistant District Attorney
Harris County District Attorney's Office, Appellate
1201 Franklin, 6th Floor
Houston, TX 77002

Defense Attorneys:  Mr. Sam Cammack (trial)
1001 W. Loop South, Ste. 700
Houston, TX 77027

Mr. Maverick Ray (trial)
1419 Franklin St.
Houston, Texas 77002

Mr. Kyle B. Johnson (appeal)
917 Franklin, Suite 320
Houston, TX 77002

Appellant:  Mr. Elmer Alvarado

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is waived.

## CITATIONS TO THE RECORD

The Record consists of a one-volume clerk's record which will be as cited "CR" followed by the document "Bates Stamp" number (e.g. "CR - 003") and eight volumes of Court Reporter's Records which will be cited by volume number followed by the page number (e.g. "Vol. 4 - p. 26").

No. 01-14-00965-CR

IN THE

COURT OF APPEALS

FOR THE

FIRST DISTRICT OF TEXAS

AT HOUSTON

_____

ELMER ALVARADO
            Appellant

VS.

THE STATE OF TEXAS
            Appellee

_____

APPELLANT'S BRIEF

_____

On Appeal from the 248th District Court
Harris County, Texas
Trial Court Cause No. 1381604

_____

TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:

NOW COMES Elmer Alvarado, Appellant herein, by and through his counsel appointed on appeal, Kyle B. Johnson, and files this his Appellant's Brief and respectfully shows the Court the following:

## STATEMENT OF THE CASE

The appellant was charged by indictment with the offense of Super-Aggravated Sexual Assault of a Child (under 6 years old), alleged to have occurred on February 16, 2013. (CR - 020). On November 17, 2014, the appellant appeared in court, plead "not guilty", and a jury trial commenced. (CR - 101).

The jury returned a verdict of "guilty" on the lesser charge of Indecency with a Child on November 20, 2014 and sentenced the appellant to 5 years in the Institutional Division of the Texas Department of Criminal Justice the same day. (CR - 102).

The trial court filed a certification of the appellant's right to appeal on November 20, 2014 (CR - 090) and the appellant filed a notice of appeal on November 25, 2014. (CR - 094).

One Motion for Extension of Time to File Appellant's Brief has been filed and granted. The current due date was June 5, 2015.

## ISSUE PRESENTED

WAS THE EVIDENCE LEGALLY SUFFICIENT TO
SUPPORT THE APPELLANT'S CONVICTION?

## STATEMENT OF FACTS

### State's Motion in Limine

Prior to voir dire, the State presented its Motion in Limine to the trial court. One of the issues which it presented was the admissibility of a portion of the complainant's pediatric records. Evidently, about 10 months prior to the alleged abuse in this case, the

viii

complainant was taken to her pediatrician (the same one that saw her just after the outcry) with complaints of a "vaginal discharge, vaginal odor, or abdomen pain." The State argued that it was irrelevant because there was no allegation of sex abuse at the time and it merely was a medical issue that had nothing to do with this case and would merely "muddy the waters". The defense argued that the earlier visit could have been the result of sex abuse (which would necessarily point to someone other than the appellant) and the defense ought to be able to go into it. It was agreed that the defense would approach the bench and argue grounds for admissibility before it went into this earlier pediatric visit. (Vol. 2 - pp. 7-8). [1]

### Voire Dire

The jury was seated without objection. (Vol. 2 - p. 186).

### State's Case

The first witness called by the State was HPD Officer Veronica Caster who was with the Juvenile Sex Crimes Division on February 21, 2013. According to Officer Caster, she was working at the Southeast Station on Mykawa Rd. when the complainant, Arjany Vallejo, was brought in by her parents. The complainant was five years old at the time and they were there to report a sexual assault. (Vol. 3 - pp. 24-28).

According to Officer Caster, the assault supposedly occurred the previous weekend, February 16, 2013. When asked if that kind of delay was "relevant", the defense objected under Tex. R. Evid. 702. That objection was overruled. The defense

---

[1] This will become an issue at the time that the pediatric records are admitted. The defense will argue that the State had opened the door during its examination of the investigating officer, Veronica Caster, and made the earlier pediatric visit relevant.

then asked to be allowed to take the witness on voir dire outside the presence of the jury "if she's going to testify as to her expertise when a child would outcry and when they would not." That request was denied. Officer Caster then testified that the fact that a complainant waits five days to report an assault does not prevent authorities from conducting an investigation. (Vol. 3 - pp. 29-30). [2]

Officer Caster testified that, after speaking with the complainant and her mother, she prepared an offense report and set up an interview with the Children's Assessment Center (CAC). According to Officer Caster, she then contacted the person "they said did it", Elmer Alvarado, the appellant. (Vol. 3 - p. 31). According to Officer Caster, the appellant was married to the complainant's aunt (on her mother's side). (Vol. 3 - p. 34).

Officer Caster testified that she did not attend the forensic interview of the complainant. According to Officer Caster, the complainant speaks Spanish and the officer had Spanish speaking officers translate it for her. According to Officer Caster, she was able to determine what happened, where it happened and by whom from the

_____

[2] While it is understandable that defense counsel would try to keep a lid on Officer Caster's testimony (a person whose personal knowledge of this case involves peripheral matters at best), her answer that a 5 day delay does not prevent authorities from conducting an investigation did not particularly draw on any "scientific, technical, or other specialized knowledge" so as to trigger an issue under Tex. R. Evid. 702. Further, the courts have held that, even though Texas Rule of Evidence 705(b) requires that defense counsel be allowed to conduct a voir dire examination (outside the jury's presence) directed to the "underlying facts or data upon which the opinion is based", a request to take a witness on voir dire to prove up her expert qualifications does not constitute a request for a Rule 705(b) hearing to inquire into the "underlying facts or data" of the expert's opinion. *See Jenkins v. State*, 912 S.W.2d 793, 814 (Tex. Crim. App. 1995) (op. on reh'g) (Where defense counsel's request to take a witness on voir dire outside the presence of the jury to prove up expert qualification was denied and the defendant complained on appeal under Tex. R. Evid. 705(b), any error was deemed waived because the complaint on appeal did not comport with the request at trial.)

interview. She also testified that she was able to determine that there were sufficient facts to file charges for Aggravated Sexual Assault of a Child. (Vol. 3 - pp. 34-35 ).

The State then asked Officer Caster if the videos of the complainant's interview were made available to the defense, to which the defense lodged on objection based on relevancy. That objection was overruled and the officer responded that they were. The State then asked whether any inconsistencies between the complainant's statement at CAC and statements she made to other people would have been noted in the offense report. The defense again objected on relevancy grounds and that objection also was overruled. (Vol. 3 - pp. 35-36 ).

The State then stated, "I'm going to ask that question again. It's important. So if there's an inconsistency between a video and what a child tells other people or in an offense report, are those things documented in your offense report?" Officer Caster responded "Correct". The State went on, "And it would be something that the defense could ask about questions here?" Officer Caster responded "Sure". (Vol. 3 - pp. 36-37 ).

Officer Caster testified that she met with the appellant at her office where he had come voluntarily.[3] He was not in custody at the time and he was allowed to leave after he spoke with the officer. (Vol. 3 - pp. 42-43).

The State then began to question Officer Caster about statements made by the appellant and the defense objected on hearsay grounds. The Court overruled those objections based on the fact that the statements were admissions of a party. The State then asked the officer if the appellant said anything about how delicate the situation was

---

3 That is where the photograph of the appellant was taken which was admitted without objection as State's Exhibit 1.

to which Officer Caster responded "Yes. He had been to several lawyers and he told--". At this point, the defense asked to approach. (Vol. 3 - pp. 43-44 ).

At the bench, defense counsel objected to this line of questioning on the grounds that the State was suggesting that the appellant actually confessed. The court said the defense would be able to clear that up on cross and Officer Caster's testimony resumed. (Vol. 3 - pp. 44-45).

Officer Caster testified that the appellant stated that "it's very delicate" and "I don't want to lose my family." According to Officer Caster, no other suspects were developed and she called the District Attorney's office and charges were filed. (Vol. 3 - pp. 46-48).

On cross, Officer Caster agreed that she found out at some point in her investigation that (the day after the outcry) the complainant denied to her pediatrician that the appellant had touched her inappropriately. (Vol. 3 - pp. 59-60). Officer Caster testified that she did not go to the complainant's school to see if anything had been said about this offense. The officer testified she assumed, had anything been said at school, it would have been reported as required. (Vol. 3 - pp. 67-68).

When asked about the appellant's statement to her about the situation being delicate, Officer Caster agreed that, at the same time, the appellant told her he was innocent and he wanted the case to be solved. The Officer was unable to say whether, at that time, she knew the complainant had told her pediatrician that nothing had happened. She also could not remember whether she told the District Attorney's Office about the

complainant's retraction and the appellant's denial when she was reviewing the case with that office for the purpose of obtaining charges. (Vol. 3 - pp. 82-83).

At one point, the defense asked Officer Caster what cases she had ever rejected and the State's objection to relevance was sustained. The defense argued that the State had opened the door when Officer Caster testified on direct that she had turned down cases on occasion. It was the defense's position that it had a right to question her about those cases. The trial court rejected that argument and the State's objection was sustained. (Vol. 3 - pp. 118-119). No offer of proof was made.

On re-direct, the State discussed the medical report from the complainant's pediatrician in which there is a statement "patient denies any inappropriate touching privates." [4] The prosecutor asked Officer Caster if "this is the only statement in any way that references Arjany or a sexual assault leading up to that on this document?" At this point, the defense requested that the entire pediatric medical record be admitted, arguing that the State had just opened the door to evidence concerning the complainant's earlier pediatric visit (concerning "vaginal discharge, vaginal odor, or abdomen pain") that was the subject of the State's Motion in Limine. The trial court responded that he could address that on re-cross. (Vol. 3 - pp. 173-174).

Officer Caster agreed the date of this allegation was Saturday, February 16, 2013. The complainant then made her outcry to her mother the next day on Sunday, February

---

4 This report was admitted without objection in redacted form as State's Exhibit No. 5. (Vol. 3 - p. 171). State's Exhibit No 5 is one page out of a 44 page medical record dated February 18, 2013, which the State argued is the only part of the record that is relevant to the allegation of sexual abuse. (Vol. 3 - p. 182).

17, 2013. The complainant's parents then took her to see her pediatrician on February 18, 2013 and the police were involved several days later. The state then entered into the following exchange with Officer Caster:

> Q.     Can you help me understand why a family who is faking it, but not seeking law enforcement might tell those lies to a doctor. Why would they do that?
>
> A.     Why?
>
> Q.     Sure. Why would a family if – as Mr. Cammack wants to suggest – if this never happened. It's a lie. Why would a family be not interested in seeking out law enforcement, not interested in involving CPS, not sure if they're going to report it, but willing to take a kid to a doctor?
>
> A.     It doesn't make any sense.
>
> Q.     It doesn't make any sense, does it?
>
> A.     No.

(Vol. 3 - pp. 176-178).

The State then offered State's Exhibit 7 for appellate purposes (State's Exhibit 7 was the complainant's entire pediatric record.) The defense then moved that the entire record be admitted and the jury was removed. (Vol. 3 - p. 180). The purpose of this motion was to introduce evidence that, 10 months prior to the alleged sexual abuse, the complainant went to her pediatrician with complaints of "vaginal discharge, vaginal odor, or abdomen pain". That issue was then taken up outside the presence of the jury.

The defense argued that the State opened the door to evidence that the complainant was taken to her pediatrician on April 19, 2012 (approximately 10 months prior to the alleged sexual assault) because of complainants of "vaginal discharge, vaginal odor, or

14

abdomen pain" when it asked Officer Caster "why would a family not interested in seeking out law enforcement take their child to the doctor?" and the officer's agreement to "that doesn't make sense". (Vol. 3 - p. 180). The State maintained that it was just a routine physical exam addressing issues of general hygiene and irrelevant to the case at hand. (Vol. 3 - pp. 183-184). The trial court disagreed with the defense that the State had opened a door that would make evidence of the April 19, 2012 pediatric visit relevant and the defenses's request to admit evidence of that visit was denied. (Vol. 3 - p. 187).

The next witness called was the complainant's mother, Ramsy Rivas. Ms. Rivas testified that she was 28 at the time of trial. She testified that the complainant was born on March 22, 2007 and was seven years old at the time of trial. (Vol. 4 - pp. 6 - 9).

According to Ms. Rivas, the appellant was married to her mother's sister (making him her uncle by marriage) and that the appellant and his wife actually raised her after her mother was deported. (Vol. 4 - p. 10).

Ms. Rivas testified that, in 2013, the appellant and his wife were living at 3202 Tidewater Drive in Houston. Ms. Rivas and her children were living in an apartment on Broadway. According to Ms. Rivas, she and her children did not go to the appellant's home that often but just on special occasions. (Vol. 4 - pp. 10-11).

Ms. Rivas testified that, on Friday, February 15, 2013, the appellant's wife called and asked if the complainant could go to a party the next day with her granddaughter, Hailey. Ms. Rivas said that she could and she took the complainant to the appellant's house around 4 p.m. on Saturday, February 16, 2013 and the complainant spent the night.

15

(Vol. 4 - pp. 13-15).

According to Ms. Rivas, the appellant and his wife lived in a three bedroom house. All three bedrooms were occupied by various family members and, when Hailey stayed over, she slept with the appellant and his wife. Ms. Rivas testified that, in the past, when the complainant stayed over, she slept in the bedroom where a female cousin slept. (Vol. 4 - pp. 16-18).

Ms. Rivas testified that, after dropping the complainant off at the appellant's house, she next saw her Sunday night around 9 p.m. She had learned that the complainant had hurt her ankle and the plan was to bathe her, put Ben Gay on the injury and then take her to the doctor the next day. According to Ms. Rivas, during her bath, the complainant was unusually fussy and didn't want her mother to touch her in the pelvic area. She testified this was the first time she had ever acted that way. According to Ms. Rivas, the complainant called that area her "toto" and also her "cookie". (Vol. 4 - pp. 18-21).

According to Ms. Rivas, after the complainant finished her bath and they were in the complainant's room, Ms. Rivas asked the complainant whom she had slept with the night before and the complainant told her. Ms. Rivas then asked her "Did someone touch you?" According to Ms. Rivas, "Her reaction was she turned and looked at me like this and she looked down, turned around and she said to me, yes. I was surprised." (Vol. 4 - pp. 21-22).

Ms. Rivas testified that the complainant told her that, during the night before, she

was in bed with the appellant and his wife and Hailey and that she was sleeping between Hailey and the appellant because Hailey wanted to sleep next to her grandmother. At some point, the complainant woke up because she felt something scratch her and she felt the appellant's hand under her panties. She then moved away and slept at the foot of the bed between the wife and Hailey. (Vol. 4 - pp. 23-24).

According to Ms. Rivas, her plan was to take the complainant to the doctor the next day and have her checked further. She was not sure why she did not call the police at that point, saying she wanted to let the complainant's father know what was going on the next day. (Evidently they were not living together at the time.) (Vol. 4 - pp. 26-27).

Ms. Rivas testified that she called Gloria, the appellant's wife, and she came over the next morning before Ms. Rivas took the complainant to the doctor. According to Ms. Rivas, Gloria's attitude was one of wanting to find out what happened. (Vol. 4 - pp. 27-28).

According to Ms. Rivas, when she took the complainant to the pediatrician the next day, she asked him to check not only the complainant's ankle but also her vaginal area. She did not tell him why, however, because she was embarrassed. According to Ms. Rivas, the doctor asked the complainant if anyone had touched her and she told him "no". She did not know why her daughter denied it and she never questioned her about it. (Vol. 4 - pp. 34-35).

According to Ms. Rivas, after the doctor's visit, she went to the complainant's school, and after speaking with someone there, she called CPS and then went to the

17

police station on Mykawa Rd.  (Vol. 4 - pp. 35-36).

 The State next called Claudia Gonzalez.  Ms. Gonzales testified that she worked at the Children's Assessment Center and was the forensic interviewer in this case.  Ms. Gonzales basically testified as to the protocol involved in interviewing children who have claimed sexual abuse.  The facts of this case were not discussed.  There were no objections to her testimony by the defense.  (Vol. 4 - pp. 104).

The last witness called by the State was the complainant, Arjany Vallejo.  At the time of trial, she was seven years old and in the second grade.  (Vol. 5 - pp. 6-7).

The State directed the complainant's attention to the night she spent the night with the appellant and his wife after going to a birthday party with Hailey.  According to the complainant, while she was at the birthday party, her "feet got twisted" while she was playing on a seesaw.  She said the kids then called Gloria (the appellant's wife) to help her. According to the complainant, the appellant was at the party as well.  (Vol. 5 - pp. 13-15).

According to the complainant, after the party, they all went back to Gloria's house. She and Hailey played for a while and then went into Gloria's bedroom and ate apples and watched Sponge Bob while sitting in the bed.  After playing for a while, she and Haley fell asleep.  (Vol. 5 - pp. 15-16).

The complainant testified that, the next thing she remembered after falling asleep was the appellant touching her "in [her] middle part".  She testified she was sleeping between the appellant and Haley and was wearing some shorts with an elastic waist that

18

Haley loaned her.  (Vol. 5 - pp. 16-17).

According to the complainant, when she testified that the appellant touched her in her middle part, she was referring to (in the State's words) her genitals.  She also testified that the appellant touched her under her clothes.  According to the complainant, she remembered the appellant "touching inside".  She also remembers his hand was moving.  Then, according to the complainant, the appellant scratched her.  She estimated this went on for about seven seconds.  The complainant testified that she then woke up the appellant's wife and told her she wanted to move.  (Vol. 5 - pp. 19-22).

The complainant then was asked if she said anything to the appellant and she responded "no".  When asked why, she then responded "Because I didn't woke him up."  She was then asked if she thought the appellant was asleep, and she responded "yes".  (Vol. 5 - p. 22).

According to the complainant, her mother came over and got her the next day but initially she was afraid to say anything about what happened because she was afraid she would be in trouble or her mother would start crying.  Later, when she was home, and after taking a bath, she ended up telling her mother what happened.  (Vol. 5 - pp. 24-26).

According to the complainant, her mother told her aunt (presumably Gloria, the appellant's wife) what happened.  And then a day later she went somewhere and talked to a lady in a room.  (Vol. 5 - pp. 26-28).

When asked about talking with Claudia (the forensic interviewer), the complainant denied telling her what happened and about what the appellant did.  She also denied

19

telling her doctor what the appellant did but would have felt comfortable doing so. (Vol. 5 - pp. 29-30).

On cross, the complainant again testified that she thought the appellant was asleep when he touched her. She also agreed that he never said anything to her, and specifically never told her not to tell anyone what happened. (Vol. 5 - pp. 50-22). She later agreed that, at the time the appellant touched her, she thought it was an accident. (Vol. 5 - p. 60). Again, later when she was asked the same thing, the complainant agreed that she thought the appellant touched her by accident, and had said that to the forensic interviewer. (Vol. 5 - pp. 64-65).

After the complainant's testimony, the jury was removed and the State indicated that it would rest. The defense then made a motion for an instructed verdict which was denied. (Vol. 5 - pp. 66-69). The parties then turned to the matter of the charge.

The defense objected to the inclusion of the lesser offense of Indecency of a Child by Contact. Its argument was basically the same as its argument for a directed verdict, that the evidence was insufficient to support the lesser. The trial court overruled the defense's objection and included an instruction on the lesser of Indecency of a Child by Touching. (Vol. 5 - pp. 69-74). With that, the jury was returned and both sides rested. (Vol. 5 - pp. 80-81).

After both sides gave closing arguments, the jury started deliberations and ultimately returned a verdict of guilty on the Lesser offense of Indecency with a Child. (Vol. 6 - p. 4).

20

State

The State put on no witnesses on punishment but introduced State's Exhibits 10, 11 and 12 which were admitted without objection. State's Exhibit 10 was a document in which the appellant stipulated to two prior convictions (a misdemeanor Theft and the misdemeanor of Unlawfully Carrying a Weapon). State's Exhibits 11 and 12 were the supporting judgments. With that the State rested. (Vol. 7 - pp. 6-7).

Defense

The defense then called the appellant"s son, Elmer Alvarado, Jr. Mr. Alvarado testified that his father had always been hard working and was looked up to by everyone. He also described how this allegation had devastated the family. The State had no questions and there were no objections. (Vol. 7 - pp. 7-13). The defense then called the appellant's wife, Gloria Alvarado. She testified that she and the appellant had been married for 25 years and that, even though they were legal residents, the appellant would be deported because of this conviction. She described him as a good father and son, and as a very good husband. According to Ms. Alvarado, the appellant was a very hard worker, sometimes leaving at 4 in the morning and returning at 8 at night six days a week. After Mrs. Alvarado's testimony, both sides rested. (Vol. 7 - pp. 13-24).

After closing arguments, the jury retired. At some point it became necessary to read an *Allen* charge. (Vol. 7 - p. 45). Ultimately, the jury returned a sentence of 5 years

in the Institutional Division of the Texas Department of Criminal Justice.  (Vol. 7 - p. 46).

<u>SOLE ISSUE PRESENTED (Restated)</u>

WAS THE EVIDENCE LEGALLY SUFFICIENT TO
SUPPORT THE APPELLANT'S CONVICTION?

<u>SUMMARY OF THE ARGUMENT</u>

Given the complainant's testimony that she thought the appellant was asleep when he touched her and did so accidentally, no rational jury could have found beyond a reasonable doubt that the appellant engaged in sexual contact intentionally and knowingly.  Accordingly, the appellant's conviction and sentence should be reversed and a judgment of acquittal entered

<u>ARGUMENT</u>

In order for a defendant to be found guilty of the offense of Indecency with a Child by Touching, the evidence must show beyond a reasonable doubt that he (1) knowingly or intentionally (2) engaged in sexual contact (3) with a child (4) younger than seventeen years of age (5) who was not his spouse.  *Guia v. State*, 723 S.W.2d 763, 765 (Tex.App.—Dallas 1986, pet. ref'd); Tex.Penal Code Ann. § 21.11(a)(1) (Vernon 1989). [5]

For the purposes of this appeal, it will be assumed that the appellant engaged in sexual contact with the complainant (since the Court is not going to reverse a jury's findings on a fact that was based on the credibility of a witness).  However, it is the evidence of the necessary *mens rea* element (of which there really was no dispute) that

---

[5] The charge to the jury was actually incorrect because it added the requirement that there be an intent on the part of the appellant to "arouse or gratify his sexual desires".  This is a requirement under the Indecency by Exposure statute but not Indecency by Touching.  However, since it actually increased the State's burden, it is hard to argue the appellant was harmed.

the appellant contends was insufficient here.

One person with personal knowledge of the events at the heart of the appellant's conviction testified at trial: the complainant, Arjany Vallejo. Every time she was posed the question, she testified that, at the time of the alleged touching, she thought the appellant was asleep and did it by accident. When asked on direct if she said anything to the appellant at the time, she responded "no" explaining that "I didn't woke him up." On cross, she again testified that she thought the appellant was asleep at the time and agreed that she thought he touched her by accident. Further, she testified that she told the forensic interviewer the same thing. She never testified that she held any other opinion at trial. The bottom line is that, if the appellant was asleep as the complainant believed, this was not an intentional or knowing act.

When considering a challenge to the sufficiency of the evidence, the reviewing court is to examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010) (plurality op .) Here, the question is whether there was sufficient evidence for the jury to find beyond a reasonable doubt that any touching by the appellant of the complainant was done knowingly or intentionally. While intent clearly can be inferred from all the circumstances surrounding an act, here, the evidence suggested that the circumstances surrounding this act was that the appellant was asleep at the time.

23

The appellant was married (it will be established later) for a considerable amount of time. His wife was in the bed with him the night in question. The complainant stated repeatedly that she thought the appellant was asleep at the time of the touching and did it accidentally. Could any rational jury (whose members were not there) hold beyond a reasonable doubt that she was wrong about that. Is it inconceivable that, while asleep, the appellant might have touched the complainant without realizing he was doing it or to whom? Certainly there was evidence to that affect. The evidence raises the very real possibility that the appellant was asleep at the time he touched the complainant and did so without the *mens rea* necessary to support his conviction.

## CONCLUSION

Given the complainant's testimony that she thought the appellant was asleep and touched her by accident, no rational jury could find beyond a reasonable doubt that the appellant was awake and touched the complainant intentionally and knowingly. The evidence, therefore, was insufficient to support a finding that the appellant had the requisite *mens rea*. Accordingly, his conviction and sentence should be reversed and a judgment of acquittal entered.

## PRAYER

It is requested that the Court find that the evidence here was insufficient to support the appellant's conviction. Further, it is requested that conviction be reversed and a judgment of acquittal entered.

24

Respectfully submitted,


   /s/ Kyle B. Johnson
Kyle B. Johnson
SBN: 10763570
The Kiam Building
929 Preston, Suite 200
Houston, Texas 77002
Tel: (713) 223-4100
Fax: (713) 224-2889


## CERTIFICATE OF COMPLIANCE

I certify that this brief is in compliance with Texas R. App. Proc. Rule 9.4(i)(3) in that it contains 4624 words.


   /s/ Kyle B. Johnson
Kyle B. Johnson

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record on this 10th day of June, 2015, to wit:

Alan Curry
Appellate Division
Harris County District Attorney's Office
1201 Franklin
Houston, Texas 77002


   /s/ Kyle B. Johnson
Kyle B. Johnson